# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the*<br>*person by name and address)*<br><br>Subject Devices | )<br>)<br>)<br>)<br>) |

Case No. 8:21-MJ-00671

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Trent W. Chandler, DEA Task Force Officer
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Santa Ana, CA_____

DOUGLAS F. McCORMICK, U.S. MAGISTRATE JUDGE
_____
*Printed name and title*

AUSA: Ann Luotto Wolf (213-393-8097)

**AFFIDAVIT**

I, Trent Chandler, being duly sworn, declare and state as follows:

### I.   TRAINING AND EXPERIENCE

1.    I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code Section 2510(7).  As such, I am empowered to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.    I am a Task Force Officer ("TFO") of the Drug Enforcement Administration ("DEA"), an agency of the U.S. Department of Justice.  I have been assigned as a TFO since March 2020 and a sworn Police Officer with the city of Irvine since March 2012.  I am currently assigned to Los Angeles Field Division ("LAFD") Orange County District Office ("OCDO").  At the OCDO, I am assigned to Enforcement Group-1 ("ENF-1"), an enforcement group investigating narcotics trafficking and money laundering violations under Titles 18 and 21 of the United States Code.

3.    During my employment as a police officer, I have investigated or assisted in the investigation of about 1,000 drug related crimes, including possession, transportation, sales, use, manufacturing, and cultivation of narcotics and narcotics-related equipment.  I have been involved in the investigation of numerous narcotic-related crimes.  I have monitored criminal narcotic activity, including the following: packaging, concealment, use,

effects, manufacturing, sales, cultivation, and transportation of narcotics.

4.    I have conducted and been involved in several mobile and static surveillances of known and suspected drug traffickers. I have accumulated over 300 hours of P.O.S.T approved specialized law enforcement training.  My training includes, but is not limited to, classes in narcotics manufacturing/trafficking, asset forfeiture, drug abuse recognition, street and prison gangs, thefts, and advanced roadside impaired driving evaluation.  I have personally arrested approximately 200 persons for crimes involving controlled substances and dangerous drug violations.  I have personally interviewed and interrogated persons arrested for various drug violations and have also witnessed interviews and interrogations conducted by other officers and Narcotic Detectives.

5.    I know that narcotics traffickers frequently use telephones, including cellular telephones, to arrange transportation and deliveries of narcotics and to coordinate the sale of narcotics.  Narcotics traffickers frequently use coded language when referring in telephone conversations to illegal narcotics, precursor chemicals, or proceeds obtained from the sale of narcotics.

6.    I know that narcotics traffickers are aware that law enforcement monitors telephones to identify illegal activity. For that reason, narcotics traffickers frequently use false names or family and/or friends' names when obtaining cellular telephones to avoid detection by law enforcement.

7.    As of July 21, 2020, I am certified by the California State Attorney General's Office to participate in the lawful interception of wire and electronic communications as authorized in Chapter 1.4, commencing with Section 629.50, of the California Penal Code.

8.    My training and education include a Bachelor of Arts in History from California State University, Fullerton.  I also obtained a Master of Arts in Criminal Justice from Arizona State University.

## II.    PURPOSE OF AFFIDAVIT

9.    This affidavit is made in support of an application for a warrant authorizing the search of two cellular telephones (collectively, the "**SUBJECT DEVICES**") seized by the Westminster Police Department from David CORTEZ-PEREGRINO ("CORTEZ-PEREGRINO") following a traffic stop on September 29, 2021.  The **SUBJECT DEVICES** are currently in the custody of the Westminster Police Department:

a.    One LG smartphone in a silver case and

b.    one black Oneplus smartphone in a green case.

10.    The **SUBJECT DEVICES** are described above and in Attachment "A" to the search warrant application.  The requested warrant seeks authorization to search for and seize evidence, fruits, and instrumentalities of violations of federal law, as specified in Attachment B, that is, violations of Title 21, United States Code, section 841(a)(1) (possession with intent to distribute controlled substances) (the "SUBJECT FEDERAL

3

OFFENSE"). Attachments A and B are incorporated herein by reference.

11. This affidavit is submitted for the limited purpose of demonstrating that there is sufficient probable cause for the requested search warrant and does not purport to set forth all my knowledge of or investigation into this matter. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and/or oral and written reports about this investigation and physical surveillance conducted by federal agents or local law enforcement agencies, which have been reported to me either directly or indirectly. When I assert that a statement was made, I have either heard the statement directly in person or through review of an audio recording or the statement was reported to me by another law enforcement officer, either orally or in written form. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.   <u>PROBABLE CAUSE</u>

12. Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, I am aware of the following:

### A.   <u>September 29, 2021, FLORES DELEON Communicates with CORTEZ-PEREGRINO</u>

13. On September 29, 2021, OCDO Special Agents ("SAs") and TFOs were conducting surveillance on Jose Zacarias FLORES DELEON ("FLORES DELEON"), a methamphetamine and fentanyl broker in the Southern California area. OCDO is currently intercepting wire

and electronic communications over FLORES DELEON's cellular phones.

14.  At approximately 2:11 p.m., CORTEZ-PEREGRINO, using phone number 714-583-4782, and FLORES DELEON, over 562-246-7919 ("TT#3"), exchanged text messages.  CORTEZ-PEREGRINO asked if there were "HH."  FLORES DELON replied, "They have not been brought over."  CORTEZ-PEREGRINO asked, "What will happen then?"  FLORES DELEON said, "Since you had not asked again, I did not insist but will call my buddy."  CORTEZ-PEREGRINO said, "I am going to need 1,000 of the blue ones too, but I need them right away."  FLORES DELEON said he would "head over there then" and asked, "Where will we meet?"  CORTEZ-PEREGRINO told FLORES DELEON to bring him both, "the HH and the 1,000."  FLORES DELEON said he did not have them yet and would "reach out" to his "buddy."  CORTEZ-PEREGRINO said he would "take the 1,000 right away," but he wanted "to know about the other too."

a.  Based on my training, experience, and knowledge of this investigation, I believe CORTEZ-PEREGRINO, using coded language, contacted FLORES DELEON to supply 1,000 fentanyl pressed "M30" pills and two kilos of "HH" ("high heat"), high quality, cocaine.  FLORES DELEON did not have the "HH" but had 1,000 pills.  FLORES DELEON stated the "HH" had not yet crossed from Mexico into the United States.  FLORES DELEON agreed to provide CORTEZ-PEREGRINO 1,000 pills right away.

15.  At approximately 3:12 p.m., FLORES DELEON called CORTEZ-PEREGRINO over TT#3.  FLORES DELON asked if CORTEZ-PEREGRINO placed the order from somewhere else already.  CORTEZ-

PEREGRINO said he called already but was waiting on a call back
from the guy.  FLORES DELEON said he was also expecting a call
back as they had one there.  FLORES DELEON said he would see how
soon it was brought over.  CORTEZ-PEREGRINO asked if it was the
same one he had asked for.  FLORES DELEON said, "Yes, the
double."  CORTEZ-PEREGRINO said he was going to wait but was
still going to need those "blue ones."  FLORES DELEON said the
"blue ones" were there.  FLORES DELEON said he had the address
and would send it in a bit.  CORTEZ-PEREGRINO said alright.

16.  At approximately 3:13 p.m., FLORES DELEON texted
CORTEZ-PEREGRINO, "13011 Monroe Street, Garden Grove."  After
learning this information, OCDO investigators headed to 13011
Monroe Street, Garden Grove.

17.  At approximately 3:45 p.m., investigators saw a dark
grey Chevy Silverado truck bearing CA license 14682D2, registered
to FLORES DELEON, park at a business complex at 8342 Garden Grove
Boulevard, next to 13011 Monroe Street.

18.  At approximately 3:53 p.m., FLORES DELEON, using TT#3,
called CORTEZ-PEREGRINO and said he was going to stop by CORTEZ-
PEREGRINO's house.  CORTEZ-PEREGRINO said he had left again.
CORTEZ-PEREGRINO said FLORES DELEON could leave "them" with
"JESSE," and CORTEZ-PEREGRINO would pay FLORES DELEON.  FLORES
DELEON told CORTEZ-PEREGRINO to go ahead and call him (JESSE).
CORTEZ-PEREGRINO said hopefully he would wake him up.

19.  At approximately 5:27 p.m., FLORES DELEON, driving the
dark grey Chevy Silverado truck, left the parking lot of the
business complex at 8342 Garden Grove Boulevard.  Investigators

followed the dark grey truck to a parking lot at 2515 W. Winston Road, Anaheim.

20.  At approximately 5:36 p.m., FLORES DELEON called CORTEZ-PEREGRINO, who said the child (JESSE) had woken up. FLORES DELEON said yes, as he just called him, and asked if he wanted him to see him there.  CORTEZ-PEREGRINO said yes, to give him a call and coordinate with him.  CORTEZ-PEREGRINO said he would give FLORES DELEON money as FLORES DELEON could go over to El Tapatio because he would be there tonight.  FLORES DELEON said that was fine.

21.  At approximately 5:41 p.m., FLORES DELEON, using TT#3, called JESSE on phone number 928-373-8628.  FLORES DELEON said he would stop by to see JESSE later.  JESSE said that was fine, as he was at home.  FLORES DELEON asked if his "uncle" (possibly CORTEZ-PEREGRINO) mentioned "it," and JESSE replied, "Yes." FLORES DELEON said he would see JESSE then.  JESSE said alright.

22.  At approximately 6:15 p.m., investigators saw the dark grey Chevy Silverado truck leave the parking lot at 2515 W. Winston Road.  At approximately 6:25 p.m., the dark grey truck pulled onto Lucille Street, Garden Grove, and investigators saw FLORES DELEON give an unknown object to an unknown male (believed to be JESSE) wearing a black sweater and a hat.

23.  At approximately 8:00 p.m., investigators saw a white Ford transit van bearing California license plate 7F59044 drive slowly north on Lucille Street and come to a stop.  A registration check showed the white Ford transit van registered to David CORTEZ-PEREGRINO, 621 S. Anthony Street, Anaheim,

California.  Investigators watched the male believed to be JESSE enter and then exit the white van and walk towards the vicinity of 13252 Lucille Street.  The white van then headed northbound on Lucille Street.  Investigators maintained surveillance of the white van.

**B.   September 29, 2021: CORTEZ-PEREGRINO Possessed Illegal Drugs with Intent to Distribute**

24.   Surveillance units contacted Westminster Police Department to assist with a traffic stop of CORTEZ-PEREGRINO.  At approximately 8:09 p.m., Detective M. Gradilla and Detective A. Lopez found the van, determined the driver violated California Vehicle Code § 22450(a)-Stop Sign Violation, and initiated a traffic stop.  CORTEZ-PEREGRINO yielded on Westminster Boulevard, west of Beach Boulevard.

25.   During the traffic stop, the driver verbally identified himself as David CORTEZ-PEREGRINO with a date of birth of May 5, 1971.  Detectives later further identified CORTEZ-PEREGRINO by his Mexico Identification card.  CORTEZ-PEREGRINO advised Detective Lopez he did not have a driver's license; it had been expired for a long time.  Detectives conducted a records check and confirmed CORTEZ-PEREGRINO had an expired driver's license.

26.   Detective Lopez had CORTEZ-PEREGRINO step out of the van.  Detective Lopez asked for consent to search the vehicle, which CORTEZ-PEREGRINO denied.

27.   Detective Lopez asked CORTEZ-PEREGRINO about driving without a valid driver's license.  CORTEZ-PEREGRINO acknowledged he knew he should not be driving.  Detective Lopez determined

that he was going to impound the van.  Pursuant to Westminster
Police Department policy, an inventory of the vehicle needed to
be conducted.

28.  During an inventory of the van, Detective Lopez located
a baggie containing several hundred blue circular pills with the
impression "M30," which he believed to be oxycodone.  Detective
Lopez also located a large amount of a white powdery substance in
a zip-lock bag.

29.  Based on the located narcotics, Detective Lopez placed
CORTEZ-PEREGRINO in handcuffs and arrested him for violation of
California Health and Safety Code §§ 11358 and 11359(a).

30.  Detective Gradilla located a brick-shaped item wrapped
in black paper with "XXX" written on it.  Detective Gradilla
opened the paper and saw a large piece of wax shaped like a
brick.  Based on the detective's training and experience, he
recognized this item to be consistent with the packaging and
concealing of narcotics.

31.  Detective Lopez also located 11 small baggies
containing a white powdery substance and two small baggies
containing oxycodone pills concealed within a caulking tube.
Within another caulking tube, Detective Lopez located another 25
baggies containing a white powdery substance and one baggie
containing a pink rocklike substance.

32.  Also found in the possession of CORTEZ-PEREGRINO was
$3,381 in U.S. Currency.

33.  In the center console, Detectives located the **SUBJECT
DEVICES**.  The **SUBJECT DEVICES** were placed into evidence at

Westminster Police Department per their policies and procedures.

## C.  OCDO Investigators Take Custody of Evidence Found in CORTEZ-PEREGRINO's Possession

34.  On October 6, 2021, OCDO investigators retrieved the drug evidence and the **SUBJECT DEVICES** from the Westminster Police Department.

35.  After weighing the drug evidence, investigators learned the 36 baggies of a white powdery substance weighed approximately 113.2 gross grams.  The one bag containing a white rocklike substance weighed approximately 37.8 gross grams.  The two plastic baggies containing "M30" pills weighed approximately 130.3 gross grams.  The one plastic baggie containing several hundred "M30" pills weighed approximately 193.7 gross grams.  The one plastic baggie containing a white powdery substance weighed approximately 473.0 gross grams.  The brick-shaped item with a wax outer coat weighed approximately 1,482.6 gross grams.

## D.  Training and Experience Regarding Practices of Drug-Traffickers

36.  From my training, experience, and the collective experiences related to me by other law enforcement officers who specialize in drug trafficking investigations, I know the following:

a.  The distribution of drugs is a continuing criminal activity that occurs over months and often years.  Drug traffickers often maintain books, records, receipts, notes, ledgers, bank records, money orders, and other papers relating to the cultivation/manufacture, transportation, ordering, sale, and

distribution of illegal controlled substances.  These individuals commonly "front" (provide illegal controlled substances on consignment) drugs and other controlled substances to their clients and, thus, keep records or communication concerning monies owed.  Such records are often stored on the drug traffickers' cellular phones, smart phones, and other digital devices.

b.   Drug traffickers use telephones, portable cellular and digital telephones, pagers, and other digital devices, sometimes in fictitious and/or other individuals' names, and maintain telephone and address books, telephone bills and other books and papers that reflect names, addresses, and/or telephone numbers of their associates in the narcotic trafficking organization and customers of narcotics.  Digital devices are often used by drug traffickers to conduct internet searches regarding information and materials relating to the manufacture and distribution of controlled substances (e.g., searches for addresses and locations where meetings and drug-sale transactions are to occur).

c.   Communications between persons buying and selling controlled substances often occur by telephone calls and messages, such as e-mail, text messages, and social media messages, sent to and from phones.  This includes sending photos of the controlled substances between the seller and the buyer, the negotiation of price, and discussion of whether participants will bring firearms and other weapons to a deal.  Such records

are often stored on the drug traffickers' cellular phones, smart phones, and other digital devices.

d.    Modern cellular telephones of the type commonly used by drug-traffickers are often set to generate and maintain digital data and records that reflect location information (e.g., Global Positioning System ("GPS") coordinates) that identify travel routes, destinations, origination points, and other locations where the subject telephone has been or traveled. Based on my training and experience, I know that drug-traffickers regularly use vehicles to facilitate their drug-trafficking activities and related money-laundering activities, e.g., to import narcotics, to transport illegal narcotics and drug-sale proceeds from one stash location to another, to deliver narcotics to other co-conspirators, and to travel to and from meeting sites to conduct drug-sale transactions.  I further know, based on my training and experience, that drug-traffickers regularly use cellular telephones while they are engaged in such activities. Thus, I believe that the **SUBJECT DEVICES** contain location information that will constitute evidence of the SUBJECT FEDERAL OFFENSE, including evidence regarding the use of taxi-type services (e.g., UBER and Lyft), the location of hotels used by the Targets, the location of co-conspirators, and the location of places used by the Targets and their co-conspirators to stash illegal narcotics and drug-sale proceeds, which money is often used to buy other drugs or laundered.

e.    Because illegal controlled substances are regularly sold in exchange for cash, drug-traffickers often

possess large amounts of U.S. currency that constitutes drug sale proceeds.  Drug traffickers often use such cash proceeds, or portions thereof, to pay off suppliers of controlled substances or to purchase more controlled substances.  To dispose of drug-sale proceeds, drug traffickers also often engage in financial transactions to convert the cash into other forms of assets, including depositing money into bank accounts; converting it to money orders, debit cards, gift cards, or digital currencies; paying various expenses; and purchasing or leasing property. Drug-traffickers often possess account records, receipts, correspondence, and electronic communications evidencing their receipt, possession, and disposition of drug-sale proceeds.

       f.   Drug-traffickers often possess firearms, as well as related items (e.g., ammunition), to defend themselves and their supply of controlled substances.  Because firearms are valuable items, drug-traffickers often possess firearms and ammunition that have been obtained as forms of barter in connection with drug-sale transactions.  Drug-traffickers often take photographs of firearms in their possession, and those photographs are often found on digital devices in the traffickers' possession.

**E.   Training and Experience Regarding Digital Devices**

37.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in

a single day or even over several weeks for a number of reasons, including the following:

a.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    It is difficult to estimate the precise storage space contained on the digital devices listed in Attachment A before conducting a preliminary examination of the device, but, based on my training and experience, I know that cellular telephones can contain multiple gigabytes of storage space.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or

1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

        d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[1] Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file.  Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file

---

      [1]  These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment.  Recovery also can require substantial time.

      e.   Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly searchable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals,

the attachment of USB flash storage devices, and the times the computer was in use.  Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment and can require substantial time.

g.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.

Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

**F.    Biometric Unlocking Features**

38.   The requested search warrant includes authorization to use the biometric unlock features of the **SUBJECT DEVICES** based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled

with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the **SUBJECT DEVICES.**

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to the **SUBJECT DEVICES** that appear to have a biometric sensor and fall within the scope of the warrant: (1) depress David CORTEZ-PEREGRINO's thumb- and/or fingers on the device(s); and (2) hold the device in front of David CORTEZ-PEREGRINO's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

///

///

///

///

///

///

///

19

## IV.   CONCLUSION

Based on the foregoing, I respectfully submit there is probable cause to believe that (a) David CORTEZ-PEREGRINO used the **SUBJECT DEVICES** to assist in acquiring and possessing controlled substances with intent to distribute and (b) evidence, fruits, and Instrumentalities of the SUBJECT FEDERAL OFFENSE will be found on the **SUBJECT DEVICES**.

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
____ day of October 2021.


_____
HONORABLE DOUGLAS F. McCORMICK
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT "A"

**PROPERTY SUBJECT TO SEARCH**

The following digital devices (the "SUBJECT DEVICES") seized from David CORTEZ-PEREGRINO by the Westminster Police Department on September 29, 2021, and currently in the custody of the Drug Enforcement Administration are subject to search pursuant to this Warrant:

1.   LG smartphone in a silver case; and

2.   Oneplus smartphone in a green case.

ATTACHMENT "B"

I. **ITEMS TO BE SEIZED**

1.    The following items are subject to search and seizure pursuant to this Warrant as they constitute evidence, fruits, or instrumentalities of violations of the SUBJECT FEDERAL OFFENSE, Possession with Intent to Distribute a Controlled Substance, in violation of Title 21, United States Code, section 841(a)(1):

a.    Photographs or videos of controlled substances, including, without limitation, cocaine, methamphetamine, heroin, fentanyl, and MDMA tablets;

b.    Photographs or videos of indicia of drug-trafficking, including digital scales, plastic baggies and containers, pay-owe records, lists of drugs and/or quantities of drugs possessed, and U.S. currency;

c.    Photographs or videos of U.S. currency, money-counting machines, and people counting, flashing, or otherwise possessing large amount of cash;

d.    Photographs or videos of firearms and/or ammunition;

e.    Photographs or videos of any individual possessing, transporting, packaging, or using any controlled substance;

f.    Records, documents, materials, programs, or applications evidencing or relating to the possession, purchase, sale, transportation, or distribution of controlled substances, including ledgers, pay-owe records, distribution or customer lists, internet searches regarding information and materials

relating to the manufacture and distribution of controlled substances, and correspondence and other records referring to the price, quantity/amount, availability, and times of sale or delivery of controlled substances;

g.   Records, documents, materials, programs, or applications referring to or otherwise evidencing the possession, deposit, transfer, or other use or disposition of U.S. currency, including photographs, deposit receipts, money orders, wire transfers, and receipts in an amount over $400 reflecting the purchase or lease of goods or services;

h.   Electronic communications regarding the possession, sale, purchase, transportation, delivery, or distribution of controlled substances or the possession, packaging, transportation, delivery, transfer, or conversion of U.S. currency, including instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, e-mail communications, or other text or written communications sent to or received from any digital device;

i.   Records, documents, materials, programs, or applications reflecting address book information and telephone communications, including contact lists with names and contact information, all stored or saved telephone numbers, and call logs, including logs of received or missed incoming calls, telephone numbers dialed from the SUBJECT DEVICES, and all telephone numbers accessed through any push-to-talk functions;

j.   Contents of any calendar or date book stored on any of the digital devices;

k.   Global Positioning System ("GPS") coordinates and other information or records indicating the past location of the SUBJECT DEVICES or David CORTEZ-PEREGRINO and the other Target Subjects, including travel routes, destinations, origination points, and other locations;

l.   The SUBJECT DEVICES, which are in themselves or which contain evidence, fruits, or instrumentalities of the SUBJECT FEDERAL OFFENSE and forensic copies thereof; and

m.   With respect to the SUBJECT DEVICES containing evidence falling within the scope of the foregoing categories of items to be seized, the following:

i.   evidence of who used, owned, or controlled the SUBJECT DEVICE at the time the things described in this warrant were created, edited, or deleted, including logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

    iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v. evidence of the times the device was used;

    vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

    viii. records of or information about Internet Protocol addresses used by the device; and

    ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

  3. In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICES capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search the SUBJECT DEVICES where they are currently located or transport them to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the SUBJECT DEVICES beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in the SUBJECT DEVICES capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICES and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

   ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   e. If the search team, while searching the SUBJECT DEVICES, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of the SUBJECT DEVICES pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

   f. If the search determines that the SUBJECT DEVICES do not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICES and delete or destroy all forensic copies thereof.

   g. If the search determines that the SUBJECT DEVICES do contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   h. If the search determines that the SUBJECT DEVICES are (1) themselves an item to be seized and/or (2) contains data falling within the list of other items to be seized, the

government may retain the digital device and any forensic copies of the digital device but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain the SUBJECT DEVICES if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the devices (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   Biometric Unlocking Features: During the execution of this search warrant, law enforcement is permitted to (1) depress David CORTEZ-PEREGRINO's thumb- and/or fingers onto the

fingerprint sensor for any SUBJECT DEVICES that have such a sensor, and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of David CORTEZ-PEREGRINO's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989).  Specifically, law enforcement personnel may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

     6.   The special procedures relating to digital devices found in this Warrant govern only the search of digital devices pursuant to the authority conferred by this Warrant and do not apply to any search of digital devices pursuant to any other court order.